**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

           v.

ZEN ALLDREDGE,

               Defendant.

23 Cr. 537 (JPC)

**SENTENCING MEMORANDUM OF ZEN ALLDREDGE**

Michael Tremonte
Anna Estevao
Claire Blumenthal Buck
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Fax: 212.202.4156
E-mail: mtremonte@shertremonte.com
       aestevao@shertremonte.com
       cblumenthalbuck@shertremonte.com

*Attorneys for Zen Alldredge*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

I.     INTRODUCTION .................................................................................................. 1

II.    PERSONAL HISTORY AND CHARACTERISTICS ......................................... 3

       A.     Childhood Poverty, Violence, and Loss ................................................. 3

       B.     Early Marriage and Eldest Son's Terminal Illness ................................ 6

       C.     Multiple Family Members' Deaths and Addiction ................................ 8

       D.     Commitment to His Surviving Family and Community ........................ 9

       E.     Offense Conduct and Arrest .................................................................. 12

       F.     Pretrial Release and Guilty Plea .......................................................... 13

III.   Presentence Report and Probation Recommendation ....................................... 14

IV.    The Guidelines Are in Conflict with 28 U.S.C. § 994(j), Which Directs That the
       Court Impose a Term Other Than Incarceration ............................................... 15

       A.     Legal Standard ...................................................................................... 16

       B.     18 U.S.C. § 371 is not an "Otherwise Serious Offense" ..................... 17

V.     THE § 3553 FACTORS WARRANT A NON-CUSTODIAL SENTENCE ....... 19

       A.     Legal Standard ...................................................................................... 19

       B.     Mr. Alldredge's History and Personal Characteristics Warrant Leniency .......... 20

              1.     Mr. Alldredge's Experiences of Poverty, Violence, and Death as a
                     Child and Young Adult Place His Mistake in Context ................ 20

              2.     Mr. Alldredge's Extraordinary Support of His Biological and
                     Adopted Children Reflects his Fundamental Goodness ............... 23

              3.     Mr. Alldredge Has Proven Himself a Devoted, Hardworking
                     Person Who is an Asset to His Community ................................. 25

       C.     The Crime, Though Serious, is Out of Character for Mr. Alldredge ................... 27

       D.     A Sentence of Time Served or Home Detention is Sufficient to Meet the
              Goals of Specific and General Deterrence ........................................... 28

i

VI.    CONCLUSION.................................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Gall v. United States*,
   552 U.S. 38 (2007)..................................................................................... 19

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024)........................................................................ 15, 17

*Pepper v. United States*,
   562 U.S. 476 (2011)................................................................................... 19

*Pfizer, Inc v. U.S. Dep't of Health & Hum. Servs.*,
   42 F.4th 67 (2d Cir. 2022) ........................................................................ 18

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y 2006)................................................... 27, 28

*United States v. Bannister*,
   786 F. Supp. 2d 617 (E.D.N.Y. 2011) ...................................................... 22

*United States v. Brady*,
   417 F.3d 326 (2d Cir. 2005)...................................................................... 20

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008).................................................................. 19, 21

*United States v. Germosen*,
   473 F. Supp. 2d 221 (D. Mass. 2007) ....................................................... 29

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012)....................................................... 25

*United States v. Hernandez*,
   No. 13 Cr. 624, 2014 WL 3511078 (E.D.N.Y. July 14, 2014) ................. 30

*United States v. Ireland*,
   No. 13 Cr. 524, 2014 WL 3725651 (E.D.N.Y. July 25, 2014) ................. 29

*United States v. LaBonte,* 520 U.S. 751 (1997) .................................... 16, 17

*United States v. Leonard*,
   No. 19 Cr. 365 (WFK), 2022 WL 17718495 (E.D.N.Y. Dec. 15, 2022)............... 23

*United States v. McBride*,
    511 F.3d 1293 (11th Cir. 2007) ........................................................... 20

*United States v. O'Neill*,
    No. 97 Cr.  (JPS), 2024 WL 2369102 (E.D. Wis. May 23, 2024) ......................................... 17

*United States v. Ortega*,
    2010 WL 2541364 (E.D.N.Y. June 17, 2010) ....................................................... 30

*United States v. Sclafani*,
    No. 08 Cr. 76 (JBW), 2009 WL 813975 (E.D.N.Y. Mar. 25, 2009) ..................................... 24

*United States v. Seemongal*,
    No. 10 Cr. 70 (JBW), 2012 WL 4049594 (E.D.N.Y. Jan. 10, 2012)..................................... 24

*United States v. Simpson*,
    319 F.3d 81 (2d Cir. 2002)................................................................... 18

*United States v. Singh*,
    877 F.3d 107 (2d Cir. 2017)................................................................. 19

*United States v. Singh*,
    No. 13 Cr. 570, 2014 WL 4773982 (E.D.N.Y. Sept. 24, 2014)........................................ 29

*United States v. Smith*,
    No. 14 Cr. 00115, 2016 WL 4679267 (E.D.N.Y. Sept. 7, 2016)....................................... 20

*United States v. Stewart*,
    761 F.3d 993 (9th Cir. 2014) ............................................................... 17

*United States v. Walker*,
    No. 16 Cr. 397 (LTS), 2021 WL 311011 (S.D.N.Y. Jan. 29, 2021)..................................... 22

*Yates v. United States*,
    574 U.S. 528 (2015)................................................................... 17, 18

**<u>Statutes</u>**

18 U.S.C. § 16 ......................................................................... 18

18 U.S.C. § 371 ................................................................... passim

18 U.S.C. § 924(c)(3) ................................................................... 18

18 U.S.C. § 3553(a) ........................................................... 19, 28, 30

18 U.S.C. § 3559(a)(4) ................................................................. 18

28 U.S.C. § 994................................................................... passim

## Rules

U.S.S.G. § 2B1.1 .................................................................................................... 14

U.S.S.G. § 3E1.1(a)-(b) ......................................................................................... 14

U.S.S.G. §§ 4C1.1(a)–(b) ...................................................................................... 14

## Other Authorities

Dudley, Richard G., Jr., M.D., *Childhood Trauma and its Effects: Implications for
    Police*, New Perspectives in Policing Bulletin, Washington, D.C.: U.S. Dep't of
    Justice, Nat'l Institute of Justice (July 2015) ..................................................... 21

Nagin, Daniel and Greg Pogansky, "Integrating Celerity, Impulsivity, and Extralegal
    Sanction Threats into a Model of General Deterrence: Theory and Evidence,"
    Criminology 39(4) (2001) ................................................................................... 29

Sapolsky, Robert, *Behave*, (2017) ......................................................................... 21

Tonry, Michael, "Purposes and Functions of Sentencing," 34 Crime & Just. 1 (2006) ............... 29

## I.      INTRODUCTION

Zen Alldredge, by and through his undersigned attorneys, Sher Tremonte LLP, respectfully submits this memorandum in anticipation of his sentencing, which is scheduled for September 10, 2024.

Mr. Alldredge has spent most of his life putting others before himself and demonstrating resilience, a strong work ethic, and goodness in the face of unyielding adversity.  He grew up in Carson City, Nevada in the 1970s, one of seven siblings raised by his mother as a single parent.  His father—an alcoholic who became violent when he drank—abandoned the family when Mr. Alldredge was still a child.  But before his father left, Mr. Alldredge regularly witnessed him beat his mother and older siblings.  Still, Mr. Alldredge craved his father's love and approval, and was devastated by his father's murder when Mr. Alldredge was thirteen.  Mr. Alldredge's mother, parenting alone, was unable to maintain consistent employment, and the family fell into poverty, surviving on federal assistance.  As a boy, Mr. Alldredge spent his free time working to help meet the family's basic needs.  He got his first paper route when he was eight and took on additional routes as he grew; he worked at the Department of Motor Vehicles ("DMV") through a work program beginning at fourteen; and he worked countless odd jobs in between.

Mr. Alldredge's adulthood was defined by the same tenacious hard work and dedication to family that he showed as a child.  He married his high school sweetheart at eighteen, and they raised five sons together—one of whom suffered from a rare, and terminal, genetic disorder requiring physically and emotionally draining care.  Although barely out of his teens, Mr. Alldredge maintained full-time employment and took on second and third jobs to afford his son's mounting medical expenses.

Even as his own family struggled, Mr. Alldredge has spent his entire adult life working to help others—with a particular focus on helping young people facing adversity early in their lives,

1

as he had.  Mr. Alldredge devoted hours to his church community as a bishop, organized and coached in a basketball league for at-risk youth, and mentored countless young people as a coach for local basketball and football leagues.  Mr. Alldredge and his wife opened their home to at least fourteen different teens in crisis, providing safety and a parent's care while each one regained his or her footing.  They took in two of those young people permanently, raised them to adulthood, and continue to provide for one of them to this day.  At the same time, Mr. Alldredge worked with the state of Nevada to open a home for children with terminal illnesses like his son's, so that they could have the high-quality medical care they needed and the community they deserved.  And he did all this quietly, just because he thought it was the right thing to do— without seeking public recognition.  The overwhelming majority of Mr. Alldredge's endeavors since childhood have been selfless, overcoming intense childhood adversity to build a stable home for his loving family.  The most consistent theme in his life has been to treat his own hardships as motivation to alleviate the suffering of neighbors, friends, and family.

Mr. Alldredge has struggled at times in the face of mounting personal hardships.  Within a single year, in 1998, Mr. Alldredge lost both the brother to whom he was closest and his half-sister.  His brother was killed by a semi-truck in a freak accident.  Only a few months later, his half-sister was murdered by her abusive husband who, after she tried to escape him, tracked her down and hung her.  Then, in 2015, Mr. Alldredge's eldest son succumbed to his medical condition, dying at only twenty-six years old.  And four years later, on his son's birthday, Mr. Alldredge's beloved mother also died after a long and painful illness.  Throughout this period, Mr. Alldredge was also the only surviving sibling to care for another brother who suffers from intense post-traumatic stress disorder and alcoholism, and cycles in and out of homelessness.  With each loss, Mr. Alldredge struggled to process his grief and, in 2020 and

2021, in the greatest lapse of judgment of his life, he agreed to and did use bank accounts he controlled to receive money that he knew to be proceeds of illegal activity. This lapse was completely out of step with Mr. Alldredge's true character. Recognizing his mistake, he accepted responsibility and pled to one count of conspiring to commit money laundering, in violation of 18 U.S.C. § 371. He feels deep remorse and shame and is determined to make amends.

Mr. Alldredge has worked hard to turn the page on his criminal conduct of nearly four years ago. He has sought counseling, recommitted himself to his family and community, and for the first time has begun reaching out *to them* for support. While on pretrial release, he has continued to support his sons financially and emotionally, and served as a key caretaker for his five grandchildren with whom he lives. For reasons described more fully below, we respectfully request that the Court impose a sentence of time served. Such a sentence properly interprets and implements section 994(j) of the Sentencing Reform Act ("SRA"), 28 U.S.C. § 994(j), and is sufficient, but not greater than necessary, in this case to achieve the goals of sentencing.[1]

## II.    PERSONAL HISTORY AND CHARACTERISTICS[2]

### A.    Childhood Poverty, Violence, and Loss

Zen Jason Alldredge was born in Portland, Oregon on ▮▮▮▮▮ 1969, the fourth of six children born to Dell Duane Alldredge, a carpenter, and Ila Biornstad Alldredge, a schoolteacher. PSR ¶ 40. Mr. Alldredge's upbringing was characterized by violence, poverty, and loss.

---

[1]    We attach to the submission letters in support of Mr. Alldredge from friends and family members as **Exhibit A**.

[2]    The following narrative is taken from counsel's interviews with Mr. Alldredge and numerous members of his family, as well as the PSR. Where phrases are quoted without citation, the quotes come from an interview with counsel.

Mr. Alldredge's parents had a tumultuous relationship, and his father was a violent alcoholic. *Id.* ¶ 44. Mr. Alldredge witnessed his father beat his mother and older brothers, *id.*; as evidenced from family photographs, his mother had a black eye on his parents' wedding day. After Mr. Alldredge's parents married, tragedy struck quickly; his mother's baby from a prior marriage, Garth, died from sudden infant death syndrome. *Id.* ¶ 41. By the time Mr. Alldredge was two years old, his parents had separated, and his father had largely abandoned the family—including a prolonged absence when he was incarcerated for writing a bad check. *Id.* ¶ 43. Ila Alldredge—left to raise a large family on her own—moved with her four children and Dell's child from another relationship to Carson City, Nevada. *Id.* ¶ 51. Despite providing no financial or emotional support, Dell Alldredge continued to reappear just long enough to conceive two additional children with Ila. *Id.* ¶ 43.

Left alone to raise seven children, Ila could no longer hold down a full-time teaching position, and the family fell into acute poverty. Although Ila worked a series of odd jobs, they survived on federal assistance. "We survived on the day-old bakery goods and canned peaches," Mr. Alldredge recalls. He spent his early childhood wearing the same patched clothes daily. PSR ¶ 43. On one occasion, his second-grade teacher—after noticing he had worn the same jeans all year—offered him a second pair. Mr. Alldredge, unaware of anything abnormal about his situation, declined the offer. Other times, he paid for basic items over time. Once, a salesman allowed him to make installment payments on a $20 pair of athletic shoes. Again, he thought nothing of it at the time; only years later did Mr. Alldredge come to appreciate the full extent of his family's economic distress.

Despite Dell Alldredge's prolonged absences, Mr. Alldredge longed for his father's support and approval. To this day, Mr. Alldredge cherishes the memory of his father attending a

single sporting event that he competed in and points to that as evidence that Dell Aldredge favored him above his other children because, sadly, Dell never attended any of their games. *Cf.* PSR ¶ 43. His father's girlfriend shot his father to death when Mr. Alldredge was just thirteen years old. *Id.* ¶ 40. Mr. Alldredge's best friend since kindergarten, Darin, attests, "I remember exact day in the 8th grade after Zen was called to the office and informed that his father had been shot and killed." Ex. A, Darin Glauner Letter. "[I]t was devastating for him." *Id.*

Despite his father's horrifying death and his family's severe economic challenges—or perhaps because of them—Mr. Alldredge exhibited empathy, determination, and self-reliance from an early age. Mr. Alldredge was extremely close with his mother, whom he describes as "amazing," and that "she did everything she could" with his siblings. PSR ¶ 44. He remained so into adulthood. "Zen has always been a very good person," Darin attests. "[W]hen several people were bullying the handicapped kids" or others on the social periphery, Darin adds, Mr. Alldredge consistently intervened "and allowed them to feel safe." Ex. A, Darin Glauner Letter.

When Mr. Alldredge was only eight years old, he got his first job as a paper boy. He took his work seriously, and quickly became responsible for three paper routes of his own. At fourteen, he entered a DMV work program two years before the minimum age—an exception made due to his critical financial situation. PSR ¶ 43. Mr. Alldredge excelled in the DMV program, while maintaining his academics and working a series of odd jobs, including as a valet at a local casino, to earn additional cash to support his mother and siblings. "My friends got to go play, but I worked," Mr. Alldredge recalled, "but it made me more appreciative of life, and the value of time." Mr. Alldredge has, as wife attests, "always been an overcomer." Ex. A, Diana Alldredge Letter.

### B.     Early Marriage and Eldest Son's Terminal Illness

Shortly after graduating high school, Mr. Alldredge married his high school sweetheart Diana Harrington.  PSR ¶ 45.  "[We] . . . basically grew up together through marriage," recalls Diana.  Ex. A, Diana Alldredge Letter.  He was "determined . . . to build the stable family that he never had," recalls his best friend, Darin, and "I was really impressed that not only was he getting married as an 18 year old man but that he worked and saved enough money to pay for [it] himself."  Ex. A, Darin Glauner Letter.

Mr. Alldredge parlayed his experience at the DMV into a job as a mechanic at the local General Motors dealership and, later, in the service and sales departments at the Toyota dealership—the beginning of a lifelong passion for rebuilding cars.  After working at the dealership during the day, he would go straight to driving the overnight tow-truck shift.  And in the few spare hours that remained, Mr. Alldredge completed mechanics and management courses to expand his professional opportunities.  PSR ¶ 65.

Shortly after Diana and Mr. Alldredge married, Diana gave birth to the couple's first child, Zen Jason "Zenny" Alldredge Jr.  Zenny was born with severe birth defects, including facial and skeletal abnormalities, intellectual disabilities, and cardiovascular problems.  *Id.* ¶ 46; Ex. A, Diana Alldredge Letter.  Zenny would never be verbal or continent.  Ex. A, Diana Alldredge Letter.  For the first three years of their son's life, Mr. Alldredge and Diana—barely out of their teens, themselves—struggled not only with Zenny's medical condition, but also with agony of not knowing his diagnosis or prognosis.  Ex. A, Kanin Alldredge Letter.  It took three years for doctors to diagnose Zenny with a rare genetic disorder—Coffin-Lowry Syndrome—and a reduced life expectancy of only 20 years.  PSR ¶ 46.  And when Zenny was twelve years old, doctors declared him terminally ill.  *Id.*

Although just nineteen when Zenny was born, Mr. Alldredge committed himself to his son's care from the start. He took Zenny to doctors' appointments, advocated for his son when doctors prescribed medications that made him a "zombie," and committed himself to "providing [Zenny] the best life he could." *Id*. Mr. Alldredge moved the family to California to get Zenny the best possible medical care. And, when his employer did not offer adequate health insurance, Mr. Alldredge took on second and third jobs. Ex. A, Kanin Alldredge Letter. After working a ten-hour day at the dealership, Mr. Alldredge's second oldest son, Kanin, recalls, his father would come home, eat dinner with his family, and then rush off to drive a tow truck, pour concrete, replace drywall, paint cars and homes, sell auto loan refinancing, or any of the numerous part-time jobs he undertook to pay for his son's needs. *Id.*

Mr. Alldredge also cared for his son physically, particularly as he matured and his condition deteriorated. "[A]s Zenny matured into a developed man," Diana attests, "Zen took over all of his hygiene requirements so that I would not have to endure the discomfort of changing and bathing our grown son." Ex. A, Diana Alldredge Letter. "Throughout all of Zenny's life, Zen was absolutely amazing: patient, dedicated, supportive, humble, and always went above and beyond." *Id.*

After Zenny was declared terminally ill, Mr. Alldredge worked with the state of Nevada to open a home that could meet his medical needs and provide a caring, supportive community for other terminally ill children. PSR ¶ 46. "I'll do anything for my family," Mr. Alldredge told counsel, "and I'm not afraid to work night and day to do it." Mr. Alldredge recognized, moreover, that "there was a massive need" for such a facility, "but no one was willing to put in the leg work to figure it out." At its height, the home Mr. Alldredge helped found served 30 residents. Eventually purchased by a corporation and now known as Rem Nevada, that home

continues to improve the lives of adolescents and adults with myriad medical conditions, PSR ¶ 46, and—thanks to Mr. Alldredge's early vision—has since expanded to offer four additional homes in the region, Ex. A, Darin Glauner Letter.  Mr. Alldredge recalls that he visited the original location where Zenny had spent the end of his life a few years ago.  "It was about five or six years after Zenny passed away," he told counsel, "but they still had a giant billboard of him in their main office.  It was pretty cool."

Zenny died March 13, 2015, at the age of 26.  PSR ¶ 46.  Mr. Alldredge still struggles to talk about the loss of his son.  "It is," he told counsel, "the worst thing in the world to lose a child.  Even nine years later, it kills me."

### C.    Multiple Family Members' Deaths and Addiction

Zenny's illness and death was bookended by additional devastating losses.  Within a single year, in 1998, Mr. Alldredge lost both his brother Kyron and half-sister Peggy Jo.  Kyron—the sibling with whom Mr. Alldredge was the "closest"—was killed when he slipped on a patch of black ice while crossing a road during a snowstorm and a semi-truck struck him.  PSR ¶ 42.  Mere months later, Mr. Alldredge's half-sister with whom he was raised, Peggy Jo, was murdered by her abusive husband who tracked her down and hung her, after she tried to escape him.  *Id.* ¶ 41.  Mr. Alldredge states simply that the loss of his siblings—particularly from such sudden, violent deaths—"brought me down."  "But you have two choices," he added to counsel, "[y]ou can put your shoulder to the wheel, or you can crumble."  Still, best friend Darin attests, the compounding losses have "seen the toll it's taken on his life." Ex. A, Darin Glauner Letter.

In 2019, only four years after Zenny's death, Mr. Alldredge's beloved mother also died after a long battle with chronic obstructive pulmonary disease.  PSR ¶ 40.  She died, Mr. Alldredge notes, on Zenny's birthday.  Mr. Alldredge had remained incredibly close to Ila

throughout adulthood. *Id.* ¶ 44. Although "not her oldest child, he was the one who planned all of the services and handled her affairs," Diana attests. Ex. A, Diana Alldredge Letter.

In the face of these devastating losses, Diana describes, Mr. Alldredge has taken a leadership role among his surviving siblings, who continually "turn to him for strength, guidance, and advice." *Id.* That includes entrusting Mr. Alldredge with responsibility for their brother, Destry, who has suffered from crippling post-traumatic stress disorder and alcoholism since his discharge from the Army in the 1990s. PSR ¶ 42. Destry lives "off the grid"— drinking 50 beers a day while dealing with intense paranoia. He has no contact with the outside world, except for Mr. Alldredge, on whom he relies for money and medical care. *Id.* Destry's illnesses, moreover, make him belligerent. Mr. Alldredge says, "he often wants to fight me" after Mr. Alldredge provides Destry with critical assistance. But Mr. Alldredge sticks with Destry—and continues to care for him as he has for the past three decades.

### D.    Commitment to His Surviving Family and Community

Mr. Alldredge acknowledges the sheer quantity of violence, death, and hardship he has experienced has been "very devastating." PSR ¶ 44. Nevertheless, as one of his sons attests, Mr. Alldredge has "kept his kind heart whole." Ex. A, Jett Alldredge Letter. As Mr. Alldredge and Diana moved further into adulthood, they cultivated a committed partnership. According to Diana, Mr. Alldredge "has been a husband who has reached across the bed at night to discover tears I was trying to hide so I wouldn't trouble him with what I considered insignificant circumstances." Ex. A, Diana Alldredge Letter. "He has offered support and comfort when I felt down," she adds. *Id.* Despite his own serious problems and responsibilities, Mr. Alldredge ensured he supported Diana's needs and always, as she emphasized, "made time for date night." *Id.* "Zen," Diana attests, "is my hero," and "I can honestly say with all integrity that I don't know a better man than my husband." *Id.*

9

Once doctors assured Mr. Alldredge that a spontaneous mutation caused Zenny's condition, Mr. Alldredge and his wife expanded their family, welcoming sons Kanin, Blaze, Jett, and Kyron.  PSR ¶ 47.  With the increased financial demands of more children, Mr. Alldredge sought out opportunities, enrolling in online classes in real estate and trading, and eventually he began working in those fields.  *Id*. ¶¶ 66–67.

Mr. Alldredge provided his sons with the love, support, and stability he had lacked as a child.  Kanin attests, "[my father] always made sure to be the first and last person I saw every day."  Ex. A, Kanin Alldredge Letter.  "He would wake me up, pray with me, help me get ready for the day, and eat breakfast together," Kanin continues.  *Id.*  At night, "[w]e would have dinner and he would help me get ready for bed," and then "[o]ur nights always ended the same: in his rocking chair."  *Id.*  "My father would then read to me, pray with me, and tuck me in every night."  *Id.*  When Kanin's peers bullied him about Zenny's condition, Mr. Alldredge was there to comfort him.  *Id.*  Blaze similarly attests that his father has "always been a pillar of strength and support."  Ex. A, Blaze Alldredge Letter.  He describes how his father taught him the value of honesty and hard work, largely through the years he trained Blaze for a career in football.  *Id.* For Jett, his father was his main confidant—the one who was "the first to hear about my heartbreak and always had the right thing to say."  Ex. A, Jett Alldredge Letter.  Kyron likewise relied on his father's advice, saying, "[m]y father is the first person I call when I feel unprepared for any distressing situation life may cause," and "I know when life challenges me, my father will give me the support I need to not only push through, but learn from him and give myself the opportunity to become a better man."  Ex. A, Kyron Alldredge Letter.  Diana attests simply: "Zen is a father . . . who is and has been nothing but exemplary his entire life."  Ex. A, Diana Alldredge Letter.

In addition to his five biological sons, Mr. Alldredge welcomed other teens facing adversity—as he had—into his family.  Mr. Alldredge fostered, and eventually adopted, a "troubled teen," Charmayne Holdeman, who Mr. Alldredge's mother had worked with through Volunteers of America.  Ex. A, Diana Alldredge Letter; *see* PSR ¶ 49.  Charmayne had had a violent childhood.  She witnessed multiple murders and suffered repeated abuse—and Mr. Alldredge, with Diana, offered her a safe and stable home.

Mr. Alldredge also took in Blaze's best friend Jenbenton "JB" Jean-Baptiste after his parents, political refugees from Haiti, lost their business and faced homelessness.  *Id.* ¶ 48.  "I realized Zen was the head of a household of eight, making me the ninth," JB attests, but "[he] welcomed me into his home," and "t[ook] care of [me] like I was one of his own."  Ex. A, Jenbenton Jean-Baptiste Letter.  JB became the first in his family to go to college and graduated debt-free—in large part, he recounts, because "Zen had encouraged me to enroll in a dual enrollment program during my junior year," which meant he earned "almost two years of a free college education while still in high school."  *Id.*  JB is now a rising 2L at Southwestern Law School and attributes his success to "the hard work and values Zen instilled in me."  *Id.* "Watching him work to support a family of 9 through their many ups and downs is exactly where I learned to adapt to my situations," he explains.  *Id.*  Mr. Alldredge continues to "open[] his home to me each time I [am] in need," JB continues—support that is particularly critical because JB is "without support from my family back home."  *Id.*  Mr. Alldredge continues to provide housing for JB when it is "simply too expensive" for him to afford, "offer[ed] his home and the time I needed to get back on my feet" after family challenges forced JB to take a leave of absence from his studies, and encouraged JB to "procure a full-time position as a litigation assistant and officially break into the legal field."  *Id.*  Even when Mr. Alldredge was intensely

struggling in the wake of Zenny's death, JB recalls, "[his] kindness never wavered," and "I was still a part of their family and taken care of." *Id.*

Throughout his adult life, Mr. Alldredge has demonstrated the same extraordinary devotion to his community as he has to his family. Diana attests that she and Mr. Alldredge have also "had over 14 teenagers who needed temporary help, live in our home for various amounts of time." Ex. A, Diana Alldredge Letter. Blaze and Diana likewise both recount how Mr. Alldredge mentored countless student-athletes—on and off the field or court—just as he coached his sons in football and basketball. *Id.*; Ex. A, Blaze Alldredge Letter. Diana attests that Mr. Alldredge demonstrated the same commitment to his role as a bishop in their church, "dedicating hundreds of hours to the congregation with everything from funeral services, to budgeting, to feeding the hungry, performing weddings, and helping to plan funerals." Ex. A, Diana Alldredge Letter. And he has been an equally active community member outside the church, Diana adds. He ran basketball leagues for at-risk youth, donated blood, collected mattresses to donate to veterans in need, and visited families in crisis. *Id.* He has adopted abandoned pets and helped friends during emergency room visits. *Id.* Best friend Darin also praises Mr. Alldredge's quiet charitable donations. Mr. Alldredge sponsored local sports and dance teams, paid for community events, and even played an essential role in securing a new K-9 unit for the local sheriff's office. Ex. A, Darin Glauner Letter. Mr. Alldredge, Darin adds, brought the same community-minded spirit to his professional life, prioritizing hiring single parents, and creating opportunities for teenagers and disabled individuals. *Id.*

### E. Offense Conduct and Arrest

From May 2020 to April 2021, Mr. Alldredge agreed with another person to conduct financial transactions involving funds he understood to be the proceeds of unlawful activity. Although he never learned the nature of that activity, *see* PSR ¶ 11; *id.* at 25–26, he

realized the transactions were designed to conceal the source of those funds, and conducted at least one such transaction.  Mr. Alldredge was arrested on October 30, 2023.

Mr. Alldredge deeply regrets his lapse in judgment and is determined to make amends.

### F.     Pretrial Release and Guilty Plea

On April 11, 2024, Mr. Alldredge entered a guilty plea to the Information with a plea agreement.  ECF No. 19.  The Information charged him with one count of conspiracy to commit money laundering.  *Id.*  Mr. Alldredge also agreed to forfeit a sum of money equal to $2,552,432.13 and a number of specific properties.  ECF No. 21.  At the change of plea hearing, Mr. Alldredge fully admitted his conduct and accepted responsibility.  The Court accepted the plea and scheduled sentencing.

Upon his release from federal custody, Mr. Alldredge returned to his sons in California. Since the offense conduct, he has redoubled his commitment to his family and community, putting even more effort into his familiar role as a dutiful sibling, husband, father, and friend. Mr. Alldredge has left all trading-related work and relies solely on passive income from a few rental properties.  He continues to support his sons and JB, financially and emotionally, as much as he can.  Mr. Alldredge lives with Kanin—now a father of five, himself—and Kanin's family, and spends much of his time caring for his grandchildren, as Diana describes, finding ways to "make[] them laugh in a world where those moments are harder and harder to find."[3]  Ex. A, Diana Alldredge Letter.  Blaze, Jett, Kyron, and JB live together, just a short distance from Mr. Alldredge and Kanin.  Mr. Alldredge sees them frequently and continues to counsel them on

---

[3]     In July 2023, Diana returned to Florida, where the Alldredges used to reside, for work. Diana had tried repeatedly to get a job as a schoolteacher in Moorland Park, California, but—due to California's different licensure requirements—was unable to do so.  She remains committed to Mr. Alldredge and sees him whenever possible, but maintains a separate household in Florida. PSR ¶ 45.

matters great and small—frequently, while working on old cars, a skill Mr. Alldredge acquired

working at General Motors and that has become a form of productive meditation. Mr. Alldredge

also has remained just as involved in caring for Destry, his church, and his community. He has

also sought, for the first time in his life, professional counseling and is beginning to process the

multiple traumas of his child and adulthood.

**III.    Presentence Report and Probation Recommendation**

On July 18, 2024, the Probation Department issued the PSR and sentencing

recommendation. The Probation Department found that the Guidelines range was 30 to 37

months based on a total offense level of 19, and the following calculations:

- The base offense level is 8, under U.S.S.G. § 2B1.1.

- Increase of 16 levels because the value of the loss was greater than $1,500,000 but
  less than $3,500,000, under U.S.S.G. § 2B1.1(b)(1)(I).

- Reduction of 2 levels because Mr. Alldredge accepted responsibility through his
  allocution and subsequent conduct prior to the imposition of sentence, under U.S.S.G.
  § 3E1.1(a).

- Reduction of 1 level because Mr. Alldredge gave timely notice of his intention to
  enter a guilty plea, thereby permitting the Government to avoid preparing for trial and
  permitting the Court to allocate its resources efficiently, under U.S.S.G. § 3E1.1(b).

- Reduction of 2 levels because Mr. Alldredge meets the criteria at U.S.S.G.
  §§ 4C1.1(a)–(b) as a Zero-Point Offender.

The PSR found that Mr. Alldredge is in Criminal History Category I. PSR at 27. The

Probation Department, however, recommended a downward variance and a sentence of 22

months with a two-year term of supervised release. It cited Mr. Alldredge's lack of criminal

history, the fact that the instant offense conduct "spanned the timeframe of approximately less than one year," and "could be categorized as aberrant behavior due to its limited duration and the fact that it appears to be a deviation by the defendant from an otherwise law-abiding life." *Id*. at 28.  It also cited "his traumatic personal history, including the deaths of many loved ones, including one of his children" as mitigating factors warranting the downward variance. *See id*. at 21.

### IV.    The Guidelines Are in Conflict with 28 U.S.C. § 994(j), Which Directs That the Court Impose a Term Other Than Incarceration

As relevant here, Section 994(j) of the Sentencing Reform Act ("SRA") provides:

> The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C. § 994(j).  The plain text of Section 994(j) unambiguously instructs the Commission to implement a default rule that first offenders should not be imprisoned, except in the narrow circumstances that they were convicted of a violent crime or equally serious offense.  Here, the offense of conviction is clearly neither a crime of violence nor an "otherwise serious offense," and therefore the Guidelines range in this case—30 to 37 months—deviates from Congressional directive and must be rejected.

To the extent the term "otherwise serious offense" is ambiguous and could be read to encompass a conspiracy to commit money laundering under 18 U.S.C. § 371, it is the duty of this Court to determine its meaning.  Indeed, the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), makes abundantly clear that this Court – and *not* the Sentencing Commission – must shoulder the responsibility of determining whether such a conspiracy constitutes an "otherwise serious offense."

A.      **Legal Standard**

The Sentencing Reform Act ("SRA") was enacted in 1984 to promote greater uniformity in federal sentencing, and established the United States Sentencing Commission for the purpose of developing the Sentencing Guidelines.  While the SRA delegates discretion to the Sentencing Commission in formulating the Guidelines, the Commission's authority is still controlled and circumscribed by 28 U.S.C. § 994.  As explained by the Supreme Court in *United States v. LaBonte*:

> Congress has delegated to the Commission significant discretion in formulating guidelines for sentencing convicted federal offenders.  Broad as that discretion may be, however, *it must bow to the specific directives of Congress*.  In determining whether [a Guideline Amendment] accurately reflects Congress' intent, we turn, as we must, to the statutory language.  If the Commission's revised commentary is at odds with [the statute's] plain language, it must give way.

*See* 520 U.S. 751, 757 (1997) (internal citations and quotation marks omitted; emphasis added). In *LaBonte*, the Court considered whether the Commission's career offender guideline conflicted with 28 U.S.C. § 994(h)'s directive that the Commission "specify a sentence to a term of imprisonment at or near the maximum term authorized" for those who qualified for career offender status.  The career offender guideline assigned the offense level based on the "maximum term of imprisonment authorized for the offense of conviction," and the commentary was amended to clarify that the maximum term referred to the basic statutory maximum, not the enhanced maximum penalty for career offenders.  The Supreme Court rejected the Commission's interpretation, determining that it contradicted Section 994(h)'s plain meaning that the Guidelines specify a term of imprisonment at or near the "maximum term authorized" for career offenders.  *Id.* at 762.  The Court declined to consider the appropriateness of *Chevron* deference because Section 994(h) was unambiguous.  *Id.* at 762 n.6.

16

In the years since *LaBonte*, courts consistently deferred to the Sentencing Commission's interpretation of the Sentencing Reform Act (either under *Chevron* or otherwise).[4]  Now, in light of the Supreme Court's groundbreaking decision in *Loper Bright*, it is clear that courts should not assume that such interpretive authority has been delegated.  Rather, *Loper Bright* teaches us that courts are in the best position to resolve statutory ambiguities, rather than the agency.  *See* 144 S. Ct. at 2263.

### B.    18 U.S.C. § 371 is not an "Otherwise Serious Offense"[5]

As an initial matter, a conspiracy to commit money laundering is clearly not a "crime of violence or an otherwise serious offense," and therefore the guidelines range is plainly inconsistent with Section 994(j) and must be rejected.  *See LaBonte*, 520 U.S. at 762.  To the extent there is any ambiguity, this Court should determine the meaning of the phrase "otherwise serious offense" without any deference to the Sentencing Commission.  *See Loper Bright*, 144 S. Ct. at 2263.

As a matter of straightforward statutory interpretation the instant offense is not an "otherwise serious offense" and incarceration is, therefore, inappropriate.  The term "otherwise serious offense" must be interpreted based on its context in the statute.  "The words immediately surrounding" a phrase or term "cabin the contextual meaning." *Yates v. United States*, 574 U.S. 528, 543 (2015).  Here, "an otherwise serious offense" immediately follows the far more specific

---

[4]    *See, e.g.*, *United States v. Stewart*, 761 F.3d 993, 998 (9th Cir. 2014) (describing circuit precedent determining that § 994(h) was ambiguous as still good law and, "only then" based on that precedent, concluding that Commission's interpretation was reasonable); *United States v. O'Neill*, No. 97 Cr. 98 (JPS), 2024 WL 2369102, at *16–17 (E.D. Wis. May 23, 2024) (applying *Chevron* deference to Commission's interpretation of § 994(t)).

[5]    In so arguing, Mr. Alldredge in no way seeks to undermine the gravity of the instant offense or suggest that he does not believe it is serious; to the contrary, it is his greatest mistake in an otherwise admirable and law-abiding life, and one for which he remains deeply remorseful and determined to make amends.

"crime of violence" language—thus suggesting offenses of equal seriousness to "crimes of violence." *Id.* Under the principle of *ejusdem generis*, an "otherwise serious offense" must be similar in quality and severity to crimes of violence. *See Pfizer, Inc v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 76 (2d Cir. 2022) ("*Ejusdem generis* refers to the understanding that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (alterations omitted)). Further, under the canon of *noscitur a sociis*, an "otherwise serious offense" should not be interpreted so as to encompass offenses of greater seriousness than crimes of violence. *See Yates*, 574 U.S. at 543 ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." (internal quotation marks omitted)).

Crimes of violence are extraordinarily serious, with serious consequences. *See* 18 U.S.C. § 16 (defined as including both (1) "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another"; and (2) "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); 18 U.S.C. § 924(c)(3) (defining a "crime of violence" similarly). By comparison, conspiracy to commit money laundering is not nearly as serious. It has a statutory maximum of five years, 18 U.S.C. § 371, and is considered a Class D felony, 18 U.S.C. § 3559(a)(4). To the extent any ambiguity remains as to the meaning of "an otherwise serious offense," it should be resolved in the defendant's favor. *See United States v. Simpson*, 319 F.3d 81, 87 (2d Cir. 2002) ("[T]he rule of lenity is generally applicable to the Sentencing Guidelines as well as criminal statutes," where

there is ambiguity).  Accordingly, because Mr. Alldredge is a first offender, has not been charged

with a crime of violence, and "an otherwise serious offense" does not encompass the instant

offense conduct, the Commission exceeded its authority under Section 944(j) in promulgating

Guidelines and application notes recommending a term of incarceration of 30 to 37 months for

the instant offense.  The Court should instead follow the clear directive of Congress and impose

a non-custodial sentence.

## V.     THE § 3553 FACTORS WARRANT A NON-CUSTODIAL SENTENCE

A sentence of time served or, in the alternative, home confinement, is also warranted here

because such a sentence is sufficient, but not greater than necessary, pursuant to 18 U.S.C.

§ 3553(a).

### A.     Legal Standard

District courts have an "overarching duty 'to impose a sentence sufficient, but not greater

than necessary,' to serve the purposes of sentencing."  *Pepper v. United States*, 562 U.S. 476,

493 (2011) (quoting 18 U.S.C. § 3553(a)).  Though a sentencing court must consider the

Guidelines as a "starting point," it must "then make an independent sentencing determination,

taking into account the 'nature and circumstances of the offense and the history and

characteristics of the defendant,' and all the statutory factors."  *United States v. Singh*, 877 F.3d

107, 116 (2d Cir. 2017) (quoting *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008)).  A

district court may not "presume that the Guidelines range is reasonable" and instead "must make

an individualized assessment based on the facts presented."  *Id.* (quoting *Gall v. United States*,

552 U.S. 38, 50 (2007)).  In doing so, "a sentencing judge must have a generosity of spirit, that

compassion which causes one to know what it is like to be in trouble and in pain."  *Id.* at 121

(internal quotation marks omitted).

**B.**     **Mr. Alldredge's History and Personal Characteristics Warrant Leniency**

    1.   <u>Mr. Alldredge's Experiences of Poverty, Violence, and Death as a Child and Young Adult Place His Mistake in Context</u>

The poverty and domestic violence of Mr. Alldredge's childhood, and the deaths of his parents, siblings, and eldest son, warrant consideration by this Court not because they excuse his conduct—they do not—but because they provide context for and explain his actions. As probation observed, "[Mr. Alldredge] endured significant trauma in his upbringing, which then continued into adulthood." PSR at 27. But as described above, Mr. Alldredge responded to these compounding traumas by seeking structure, responsibility, and the family and community he had lacked. When his closest family members died untimely deaths, moreover, he stepped in to care for his remaining siblings—just as he has cared for his nuclear family, Charmayne, JB, and countless members of his religious and secular communities.

Childhood exposure to domestic violence and extreme poverty has been recognized as a mitigating factor at sentencing. *See, e.g.*, *United States v. Smith*, No. 14 Cr. 00115, 2016 WL 4679267, at *4 (E.D.N.Y. Sept. 7, 2016) (considering defendant's "traumatic childhood," including "domestic violence, and all of the stressors associated with extreme poverty," and the fact that "[s]he has worked hard to protect her children from her own experiences," as factors making a custodial sentence "unnecessary"); *cf., e.g.*, *United States v. McBride*, 511 F.3d 1293, 1297–98 (11th Cir. 2007) (affirming sentencing court's determination that history of abuse and abandonment supported downward variance from 151 to 188 months imprisonment to 84 months); *United States v. Brady*, 417 F.3d 326, 333 (2d Cir. 2005) (noting, in mandatory Guidelines case, that "a downward departure may be warranted on the ground[s] that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense" (internal quotation marks omitted)).

20

That is for good reason.  Recent research underscores how childhood adversity—and, childhood encounters with domestic violence and poverty, in particular—permanently alters brain physiology in adulthood.  Childhood experiences like Mr. Alldredge's, for example, "accelerate[] amygdaloid maturation in a particular way."  Robert Sapolsky, <u>Behave</u> 196 (2017). "Normally," Stanford neurologist Robert Sapolsky explains, "the frontal cortex gains the ability to inhibit the amygdala, saying, 'I wouldn't do this if I were you.'"  *Id.*  "But after childhood adversity, the amygdala develops the ability to inhibit the frontal cortex," *id.*—inverting the power dynamic between two parts of the brain that are, broadly speaking, associated with impulse and emotion (amygdala) and analytical cognition (frontal cortex), *see generally id.* at 21–80.  The results are increased challenges with impulse control, a greater risk of anxiety disorders, addiction, and depression, *id.* at 196–97—and, critically, greater difficulty "assessing a perceived threat and responding appropriately" and "differentiat[ing] dangerous situations from safe ones."[6]  The impact of repeated childhood trauma should be considered in connection with Mr. Alldredge's failure of impulse control in this case, for which he accepts full responsibility.

The challenges Mr. Alldredge faced as a child and the repeated severe losses he experienced as an adult (and particularly as a parent) further merits the Court's consideration because—prior to pretrial's recommendation of mental health counseling a few months ago—he had had no meaningful opportunity to process the psychological impact of his father's brutal

---

[6]     *See* Dudley, Richard G., Jr., M.D., *Childhood Trauma and its Effects: Implications for Police*, New Perspectives in Policing Bulletin, Washington, D.C.: U.S. Dep't of Justice, Nat'l Institute of Justice (July 2015), at 6; *see id.* at 4–9 ("The combination of repeated childhood trauma and the absence of parental nurture, support and protection can result in the development of multiple psychiatric and neuropsychiatric disorders," that can manifest in numerous ways, including neuropsychological symptoms similar to PTSD (e.g., hypervigilance, anxiety, hyperanxiety); developmental difficulties, and other challenges like depression, substance abuse, and self-medication, and overdevelopment of the amygdala.)

violence toward his mother and older siblings, his childhood poverty, or his father and Peggy Jo's murders, Kyron and Zenny's untimely deaths, his mother's passing, and Destry's severe mental illness.  Despite these severe difficulties, Mr. Alldredge did his best "to block out" his pain and focus, instead, on alleviating the pain of others.  Those close to Mr. Alldredge, like Darin Glauner, attest that—even though "[he] tries not to let things affect him"—"I've seen the toll it's [sic] taken on his life (the sleepless nights, anxiety and concern)."  Ex. A, Darin Glauner Letter.  Mr. Alldredge hopes to work through the psychological and emotional ramifications of the hardships he has faced in the past with the help of continued, and more frequent, counselling sessions.

Beyond explaining his participation in the charged conspiracy, Mr. Alldredge's childhood exposure to domestic violence, murder, and extreme poverty—and the repeated losses he suffered as an adult—should be considered alongside with his decades of hard work to provide for his family and community through legitimate employment.  Courts have routinely recognized such facts to be mitigating factors for sentencing.  *See, e.g.*, *United States v. Walker*, No. 16 Cr. 397 (LTS), 2021 WL 311011, at *2 (S.D.N.Y. Jan. 29, 2021) (explaining that the court had considered, among other things, "the unfortunate circumstances of [the defendant's] childhood, his exposure at a young age to incidents of violence, and his success, despite these challenges, in holding a series of legitimate jobs," in varying downward by 18 months); *see generally United States v. Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011) (discussing, *inter alia*, defendants' childhood abuse and efforts to obtain employment and provide stable homelives for their families as bases for reduced sentences).  Against the backdrop of such significant adversity, Mr. Alldredge's decades of unrelenting hard work, devoted parenting, and community service are even more remarkable.

22

2.    Mr. Alldredge's Extraordinary Support of His Biological and Adopted Children Reflects his Fundamental Goodness

The Court should also consider Mr. Alldredge's remarkable involvement with, and example for, his sons in fashioning a sentence—especially against the backdrop of his own unstable childhood.  *See, e.g.*, *United States v. Leonard*, No. 19 Cr. 365 (WFK), 2022 WL 17718495, at *2 (E.D.N.Y. Dec. 15, 2022) (noting letters from defendant's mother and wife describing him as an amazing father).  Particularly given his own father's lack of example, Mr. Alldredge's selflessness and devotion as a parent are a testament to his foundational goodness.  All four of his and Diana's surviving sons, and JB, are living "happy, productive lives"—a feat, Diana emphasizes, that is "no coincidence," but rather "proof of Zen's character." Ex. A, Diana Alldredge Letter.

Each young man, moreover, attributes his success to Mr. Alldredge's support and example.  Now in his thirties, Kanin is a proud and devoted father of five.  "Despite [Mr. Alldredge's] lack of an example," Kanin attests, "my father showed me how to balance life's responsibilities and obligations while ensuring each child is made to feel like a priority."  Ex. A, Kanin Alldredge Letter.  Kanin describes the "gift of peace, safety, and love my father gave to me" as foundational to his own approach to fatherhood.  *Id.*  Memories of evenings in his father's rocking chair—of his father "wrap[ping] my brother and me in his arms" nightly, and "tell[ing] us stories, read[ing] to us, and help[ing] me escape the challenges of growing up"—are "why, as a father to [five] children . . . I make it a nightly ritual to rock my children, to tell them stories, to read to them, to pray with them, and to tuck them in their beds."  *Id.*  Kanin also cites his father's support and example of gritty, hard work as a professional inspiration; he recently graduated from law school and passed the bar exam, fulfilling a longtime dream.  PSR ¶ 47.

23

Blaze, meanwhile, played professional football before transitioning to training to be an airline pilot.  *Id.*  He attests that, "[d]espite facing challenges, [his father] has consistently demonstrated resilience and determination, striving to provide for us and instill in us the values of honesty and hard work."  Ex. A, Blaze Alldredge Letter.  Jett, too, is earning his commercial pilot's license.  PSR ¶ 47.  He credits his father's example of hard work, familial love, and piety as the reason he has "grown into a man with a strong moral compass and sense of right."  Ex. A, Jett Alldredge Letter.  And Kyron, who is studying at Gnomon Game Design School, PSR ¶ 47, attests that his father's "dedication [to his family] speaks to his character as a whole," Ex. A, Kyron Alldredge Letter.  JB likewise attests that Mr. Alldredge "taught me . . . a strong work ethic, kindness, and adaptability," and states simply that, without him, "I would not be on the path I am today."  Ex. A, Jenbenton Jean-Baptiste Letter.  And all Mr. Alldredge has ever asked in return for his extraordinary generosity, JB adds, is that JB "[p]ay it forward."  *Id.*

Mr. Alldredge's children and grandchildren, moreover, continue to rely on his financial and emotional support.  Kanin attests that his father funds his five children's participation in various educational programs and local sport leagues.  Ex. A, Kanin Alldredge Letter.  More important, Mr. Alldredge is a key childcare provider for Kanin's children, with whom he lives and in whose daily lives he is integrally involved.  *Cf. United States v. Seemongal*, No. 10 Cr. 70 (JBW), 2012 WL 4049594 at *2–3 (E.D.N.Y. Jan. 10, 2012) (imposing sentence of time served, where defendant had total offense level of 18, where "incarceration would prove ruinous for defendant and her children," the "conduct that led to the instant prosecution appear[ed] to be aberrant," restitution had been ordered, and it was "unlikely that the defendant [would] engage in further criminal activity in light of her family ties and her regret for her past misdeed"); *United States v. Sclafani*, No. 08 Cr. 76 (JBW), 2009 WL 813975, at *2 (E.D.N.Y. Mar. 25, 2009)

(considering defendant's critical role as a caregiver for his grandchildren).  JB likewise relies on Mr. Alldredge for advice, financial help, and housing.  Ex. A, Jenbenton Jean-Baptiste Letter. And Mr. Alldredge's youngest son, Kyron, also needs his father's support.  He attests, "I am coming to a point in my life when I feel I will need him the most," when "I have only just begun navigating the difficulties of adulthood."  Ex. A, Kyron Alldredge Letter.

> 3.    Mr. Alldredge Has Proven Himself a Devoted, Hardworking Person Who is an Asset to His Community

Mr. Alldredge's remarkable contributions to his community further weigh in favor of a non-custodial sentence.  Mr. Alldredge has donated significant funds to community members and organizations, but his non-monetary contributions—opening his home, parenting and mentoring young people, and starting an organization to support individuals diagnosed with conditions like Zenny's—set this case apart and merit the Court's particular consideration.  *See United States v. Collins*, No. 07 Cr. 1170 (LAP), ECF No. 244 at 22 (varying downward from Guidelines sentence of 95 years or life for involvement in scheme defrauding investors of billions, and sentencing defendant to a year and a day, based on defendant's good works because "it can fairly be said that but for this matter [the defendant] is a certifiable saint"); *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012) (varying downward where "[t]he Court can say without exaggeration that it has never encountered a defendant whose prior history suggests such an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need").  Mr. Alldredge has proven, time and again, that his response to adversity is to help those around him.  He would do the same here, to his community's benefit, if granted a non-custodial sentence.

Mr. Alldredge has supported and mentored young people through adversity—an impressively constructive response to his own childhood experience and a testament to his

25

fundamental goodness.  In partnership with Diana, Mr. Alldredge permanently welcomed Charmayne and JB into his family.  *See Collins*, No. 07 Cr. 1170, ECF No. 244 at 23–24 (underscoring, as a basis for varying downward, that the defendant took in his son's classmate, who "became a member of the [defendant's] family," and his sister's children, who viewed him as a father).  Also with Diana, Mr. Alldredge provided a stable, supportive home for fourteen additional teens in crisis on a temporary basis, while simultaneously providing pivotal guidance as a football and basketball coach for hundreds of young people in their Florida and California communities.  *See id.* at 25–26 (emphasizing the defendant's mentorship of "at-risk children from Chicago's poorest neighborhoods" in varying downward).  Mr. Alldredge, Diana attests, "doesn't sit at home in the evening to watch his favorite shows," but "[i]nstead, he visits families in need" and "runs church basketball leagues."  Ex. A, Diana Alldredge Letter.

Mr. Alldredge's creation of Rem Nevada in response to Zenny's terminal diagnosis is yet further evidence of his compassion and commitment to acting on that compassion.  Even as his own son suffered and Mr. Alldredge shouldered the primary physical and financial burdens for his care, he thought of others.  He was determined to provide a secure, loving home for kids like his beloved son.  Darin describes how the home that would become Rem Nevada started small, with Mr. Alldredge "provid[ing] shelter, nursing and a community for 4 special needs/terminally ill children."  Ex. A, Darin Glauner Letter.  Rem Nevada now offers a wide array of services for adolescents and adults with intellectual and developmental disabilities, including day programs, community-based residences, independent living services, and host homes.[7]  It has transformed the lives of hundreds, and continues to do so.

---

[7]     "Our Services," *Rem Nevada* (last accessed Aug. 15, 2024), https://www.rem-nevada.com/our-services/.

Mr. Alldredge's extraordinary contributions to his community, moreover, were not the result of "a postarrest conversion." *Collins*, No. 07 Cr. 1170, ECF No. 244 at 23 (noting that defendant's good works predated arrest as a basis for varying downward). Nor were they undertaken to gain status or enhance his public image. *See id.* at 26 (contrasting defendant with "many of the white collar defendants we see in this Court who put their names on fancy buildings"); *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y 2006) (same). Each was done quietly—because Mr. Alldredge saw a problem that needed fixing and set out to fix it. Mr. Alldredge's absence, as his wife attests, would be an active disservice to his community and "the many who benefit from his giving nature, ethical character, and moral example." Ex. A, Diana Alldredge Letter. JB echoes that sentiment, and says any term of incarceration would be a "waste and detriment to those closest to and around him and such a loss to the community." Ex. A, Jenbenton Jean-Baptiste Letter.

### C.    The Crime, Though Serious, is Out of Character for Mr. Alldredge

Neither the undersigned nor Mr. Alldredge seeks to minimize in any way the seriousness of the offense or Mr. Alldredge's lapse in judgement. Nevertheless, it is important to acknowledge—as the PSR does explicitly—that this crime is inconsistent with Mr. Alldredge's fundamental character. *See* PSR at 28 ("[T]he instant offense could be categorized as aberrant behavior due to its limited duration and the fact that it appears to be a deviation by the defendant from an otherwise law-abiding life."). He has otherwise lived an honorable life overwhelmingly defined by his commitment to family, community, and hard work at legitimate employment, even in the face of adversity. *See id.*; *see also id.* ¶¶ 33–38.

Those closest to Mr. Alldredge attest uniformly to his "lifetime of integrity, hard work, and moral fiber" in the face of mounting challenges. Ex. A, Diana Alldredge Letter. With this case as the only notable exception, Mr. Alldredge has overwhelmingly chosen goodness and

27

service to others and—despite limited role models in his own life—been consistently

"trustworthy, upstanding, of the finest character, and an asset to any friend, family member, [or]

community."  *Id*.  Consistent with that ethos, Mr. Alldredge has committed to taking

responsibility for his mistakes and making amends in the year since his arrest.  He has sought

professional mental health counseling and his doctor reports he is "forthcoming," an "active and

engaging participant during sessions," and "takes accountability for his actions."  Ex. A, ███

███ Letter.

Mr. Alldredge's positive characteristics, adherence to the rule of law for the majority of

his lifetime, dedication to his family, and remarkable contributions to his community in the face

of adversity should weigh heavily in favor of a lenient sentence.  *See Adelson*, 441 F. Supp. 2d at

513–14 ("But, surely, if ever a man is to receive credit for the good he has done, and his

immediate misconduct assessed in the context of his overall life hitherto, it should be at the

moment of his sentencing, when his very future hangs in the balance.  This elementary principle

of weighing the good with the bad, which is basic to all the great religions, moral philosophies,

and systems of justice, was plainly part of what Congress had in mind when it directed courts to

consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'").

### D.    A Sentence of Time Served or Home Detention is Sufficient to Meet the Goals of Specific and General Deterrence

Given Mr. Alldredge's demonstrated commitment to his family, community, and hard

work, and his family's commitment to him, he is highly unlikely to recidivate.  A non-custodial

sentence would accomplish the goals of general and specific deterrence here, and any term of

imprisonment would be "greater than necessary" to achieve the goals of sentencing.  18 U.S.C.

§ 3553(a).

Courts in this Circuit have repeatedly recognized that felony convictions and their collateral consequences, alone, may accomplish general deterrence.  *See, e.g.*, *United States v. Singh*, No. 13 Cr. 570, 2014 WL 4773982, at *2 (E.D.N.Y. Sept. 24, 2014) ("General deterrence is satisfied by the felony conviction and its collateral consequences."); *United States v. Ireland*, No. 13 Cr. 524, 2014 WL 3725651, at *2 (E.D.N.Y. July 25, 2014) (same).  Mr. Alldredge's felony conviction will "affect every government or private application he seeks, every loan he applies for, every government benefit he tries to obtain."  *United States v. Germosen*, 473 F. Supp. 2d 221, 230 (D. Mass. 2007).

Moreover, numerous studies, including those conducted by the Department of Justice, have found that "punishment certainty is far more consistently found to deter crime than punishment severity."  Daniel Nagin and Greg Pogansky, "Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence," Criminology 39(4) (2001); *accord* U.S. Dep't of Justice, Nat'l Institute of Justice, Five Things About Deterrence, (last visited Aug. 26, 2024) https://www.nij.gov/five-things/pages/deterrence.aspx  ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."); Michael Tonry, "Purposes and Functions of Sentencing," 34 Crime & Just. 1, 28 (2006) (while the certainty of being caught and punished has a deterrent effect, research shows that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects").  That Mr. Alldredge was apprehended and charged approximately three years after the instant offense, and is now being sentenced over four years later, sends a strong message that those who conspire to launder money will inevitably be caught and punished.  The empirical evidence shows that this fact achieves general deterrence.  Any term of imprisonment will not achieve additional general deterrence, and thus,

on this score, would be "greater than necessary" to achieve the goals of sentencing.  18 U.S.C. § 3553(a).

A sentence of time served would also accomplish specific deterrence.  The consequences of Mr. Alldredge's felony conviction are intensified because it will effectively bar him from ever working in finance again—the field in which he spent the past twenty-five years.  PSR ¶ 69; *cf. United States v. Hernandez*, No. 13 Cr. 624, 2014 WL 3511078, at *2 (E.D.N.Y. July 14, 2014) (specific deterrence substantially achieved through, in part, impact of conviction on defendant's employability).  Mr. Alldredge, moreover, is fifty-five years old, has no criminal history, and complied perfectly with all pretrial release conditions.  PSR ¶¶ 6, 33–38, 40.  These characteristics make him statistically among the least likely offenders to recidivate.  The Sentencing Commission has found that first offenders of any age are far less likely to recidivate than those with criminal histories, and that recidivism risk declines as age increases.[8]

Mr. Alldredge, moreover, has demonstrated for the majority of his life, remarkable character, work ethic, and dedication to his family and community.  And in such cases, where a defendant has demonstrated fundamentally good character, "specific deterrence is not a major concern."  *United States v. Ortega*, 2010 WL 2541364, at *2 (E.D.N.Y. June 17, 2010).  This is especially true here, given that Mr. Alldredge has acknowledged his crime, accepted responsibility, left the career field in which he engaged in criminal wrongdoing, and remains an integral emotional and financial support to his wife and children.  Mr. Alldredge's close relationships with his family, their awareness of the instant case, and their notable commitment

---

[8]     *See* "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," *U.S. Sentencing Comm'n* (May 2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

to him and his law-abiding future further negate any possibility of recidivism.  For example, Mr. Alldredge's eldest surviving son, Kanin—himself an attorney—has accompanied his father to every court proceeding and played an admirably active role in his father's legal counsel.  With Kanin's and his family's attentive support, Mr. Alldredge's specific deterrence is virtually assured.

Above all, as he will discuss at sentencing, Mr. Alldredge feels deep, genuine remorse and shame.  He is, in short, among the least likely offenders to recidivate.

## VI.    CONCLUSION

As Mr. Alldredge will explain in his own words at sentencing, he is deeply remorseful. He recognizes the severity of his conduct and makes no excuse for his mistakes.  But given the extraordinary life he has lived, the hardships he faced as a child and for much of his adulthood, his overwhelmingly law-abiding and industrious life, and his commitment to his family and community, we respectfully urge the Court to temper justice with mercy and impose a non-custodial sentence.

Dated: New York, New York
      August 27, 2024

Respectfully submitted,

By:    /s/ *Michael Tremonte*
     Michael Tremonte
     Anna Estevao
     Claire Blumenthal Buck
     Sher Tremonte LLP
     90 Broad Street, 23rd Floor
     New York, NY 10004
     (212) 202-2600
